## ST. PAUL FIRE & MARINE INS. CO. v. PECK.

No. 7471—Opinion Filed June 20, 1916.

(158 Pac. 595.)

**Appeal and Error—New Trial—Discretionary Ruling—"Discretion of Court."**

The granting or refusal of a new trial is always a matter largely within the legal "discretion" of the trial court, and, unless it clearly appears that such discretion has been abused by disregard of the established rules of law, its action will not be disturbed upon appeal.

(Syllabus by Bleakmore, C.)

Error from District Court, Kingfisher County; James B. Cullison, Judge.

Action by S. E. Peck against the St. Paul Fire & Marine Insurance Company. Judgment for plaintiff, and defendant brings error. Affirmed.

F. L. Boynton and Burwell, Crockett & Johnson, for plaintiff in error.

D. K. Cunningham, for defendant in error.

Opinion by BLEAKMORE, C. In April, 1910, S. E. Peck obtained judgment in the district court of Kingfisher county, Okla., against the St. Paul Fire & Marine Insurance Company in the sum of $543, on an insurance policy issued to him by the company, whereby it insured him against loss or damage on account of the death of a certain horse, which judgment upon appeal was affirmed by this court on February 17, 1914. Pending such appeal, on January 5, 1911, the insurance

company commenced this proceeding by filing in the original action a verified petition seeking the vacation of said judgment and a new trial. On January 5, 1915, demurrer to such petition was sustained and a new trial refused. The insurance company has appealed, assigning as error the action of the court below in refusing a new trial.

The petition for a new trial sets forth all the pleadings and proceedings in the cause proper, including the judgment sought to be vacated, and alleges that the court therein charged the jury that:

"The defendant insurance company files a general denial which in law denies that the stallion was killed by lightning and that it was worth $500. The controverted questions for you to determine are: First, whether or not the stallion was killed by lightning; and, second, if so, what was the value at the time it was killed?"

It is also alleged that upon the trial of such issues the only evidence of the value of the horse was that of S. E. Peck, who testified that it was worth $700 or $800 at the time of its death. It is further alleged:

"The defendant alleges that the plaintiff, in order to prove his cause of action against the defendant, practiced a gross fraud in order to obtain the verdict and the judgment, in testifying as he testified in the trial of said action, because such testimony was utterly false and known by him at the time to be wholly untrue; that the horse was not of the value of $500 because of concealed defects which were known to no other person than the plaintiff, himself.

"The defendant alleges that at the time this action was tried there was pending in the county court of Kingfisher county, Okla., an action brought by one S. M. Hope in which the plaintiff in this action was defendant in that action and had filed an answer alleging that the horse insured was entirely worthless and of no value whatever; that said answer was unverified and was offered in evidence in the trial of this action; that the trial of said case of S. M. Hope against S. E. Peck was had in the county court on or about the 18th day of May, 1910, and the plaintiff S. E. Peck, while the defendant in that action and seeking to substantiate and prove the truth of his answer therein in order to escape recovery of the purchase price of the horse from his vendor, testified that said horse was wholly and utterly worthless. This defendant attaches to this petition a copy of the answer in said case of Hope against Peck and marks said copy 'Exhibit B' and makes the same a part hereof. This defendant also attaches hereto a transcript of the evidence which was given by S. E. Peck in the trial of this case of Hope against Peck and marks the same 'Exhibit C' and makes the same a part hereof.

"This defendant alleges that the statements which the said S. E. Peck made in the trial of the action against him by S. M. Hope were true, and that said stallion was worthless as he alleged in his answer and swore as shown by his testimony."

The testimony of Peck upon the trial of the case in the county court is set forth in full, and excerpts therefrom are copied in the briefs, from which we quote as follows:

"I bought a stallion in January, 1904, of S. M. Hope. He came to my house. He represented him to be a registered horse from France. He said he was a sure foal getter, guaranteed better than 60 per cent. But for these statements I would not have bought the horse. * * * Q. You swear in your petition (answer) here that the horse is not worth $200. A. As a breeder he is not worth anything. Q. But you recovered $500 insurance? A. I didn't recover that as a breeder. Q. Just as a horse? A. They took the insurance and I paid the premium. Q. How much did you represent in your application that the horse was worth? A. I expect $600 or $700. Q. Look at this application. A. Well, I expect that is it. Yes, that is it. Q. Is that your signature? A. Yes. Q. What is it. A. $1,500. Q. And he allowed you that much? A. If he put the horse in at that he would allow me $1,000. He wanted to know what the horse cost, and I told him, and we talked about the insurance, and I said $500 is the least I would take out. I said: 'There is the horse; go and look at him.' As far as $1,500 is concerned, he took that in his own hands. I never told him $1,500. That is only the insurance deal. Q. You say the horse is not worth $200. Did you not, in a deposition taken in the other trial, make answer to the following question—I will ask you if you didn't make answer to the following questions: 'What was that horse worth at the time he died?' 'No, sir, I don't think so—' 'Was he worth as much as $200?' 'You wouldn't have bought him for $500.' Did you make that statement? A. Yes; that horse—I got him in pretty fair shape, the last year I had him, and he cost me a pile of money to do it. Q. You swore in that case, Mr. Peck, that the horse was worth $800 at the time he died, didn't you? Didn't you swear that on the witness stand in the district court? A. I wouldn't say what I said. Q. Then, if we got your evidence to that effect, would that be correct? A. Whatever the record is. Q. Do you deny that you swore that he was worth $800? A. I told you I didn't remember whether I said that. Q. Could you swear it was worth anything? A. At what time? Q. In the trial of that other case against the insurance company? A. That horse for the last two years was worth four times what he was the first three. Q. Did you swear in your answer that he was not worth $200. A. Yes, as a breeder. Q. Well, what was he worth for any purpose? A. You bet your life. Q. What was he worth for that? A. He wasn't worth nothing as a breeder the first three years. Q. How did he happen to be worth $800? A. I never put in that $1,500. (Record 62-64.) Q. If you had known the

condition of that horse and his qualities as you do now, would you have signed those notes? A. No, sir; not at all. Q. Would you have bought that horse at any price? A. No, sir; I wouldn't have him. I wouldn't keep him as a gift. (R. 65.) Q. What damage do you consider it was worth to you to buy that horse? A. A thousand dollars would not clear me. Q. Do you swear that you did not state that the horse was worth $800 (referring to evidence in insurance trial). A. I will tell you what I said. I said I was holding the horse at $800. I never did offer him for less than that. But I had an offer for him. Q. But you said to the jury that he was worth $800. A. I said I was holding him at that. Q. If any one is present that heard you make that statement they will be mistaken? A. They will be like that letter. There is not a word of truth in that. Q. You saw a chance to stick the insurance company, didn't you? A. That's my business. Q. How do you reconcile these two suits? Do you mean to say—— A. He wants to help the insurance company out. Q. Did you swear on the stand in that case that the horse was worth from $800 to $1,000? A. No, sir. Q. Then you swore that the horse was not worth $800? A. I said I was holding him at $800."

It is insisted that the judgment sought to be vacated was obtained by the fraud of Peck in wilfully and corruptly perjuring himself upon the trial of the original cause, relative to the value of the stallion; and by reason thereof, under the rule announced in El Reno Fire Ins. Co. v. Sutton, 41 Okla. 297, 137 Pac. 700, 50 L. R. A. (N. S.) 1064, the insurance company is entitled to the vacation of such judgment and a new trial as a matter of right.

The court below obviously failed to take the view of the plaintiff in error that the evidence of Peck upon the trial in the county court established the falsity of his testimony as to the value of the horse on the former trial of the action against the insurance company, and refused to brand him as a perjurer. It will be noted that Peck swore in the county court:

"Yes, that horse—I got him in pretty fair shape the last year I had him, and he cost me a pile of money to do it. * * * That horse for the last two years was worth four times what he was the first three."

But if it be conceded that perjury was committed by Peck upon one or the other of the trials, how can we determine that it was in the case against the insurance company, and induced the verdict and rendition of the judgment sought to be set aside in this proceeding? No fact or circumstance other than the inconsistency in his testimony given at different times is offered to sustain the conclusion for which plaintiff in error contends.

Should it be held that the judgment attacked in the instant proceeding was obtained by perjury, might it not with equal propriety and accuracy be decided upon hearing of a petition for new trial of the case in the county court that the judgment there obtained was likewise the result of false swearing, and that such fact was established by the evidence adduced upon the original trial of this case?

In the brief of plaintiff in error it is stated:

"It must be borne in mind that the pivotal question for determination in the original action in this cause was the value of the property destroyed. The court, in his instructions, distinctly instructs on that question. The only witness who testified as to the value of the stallion was the plaintiff himself."

Such being the case, it is manifest that plaintiff in error could not have been misled relative to such issue; and yet it did not attempt to meet the same by offering any evidence in this regard, and even in its present petition has failed to allege that upon a new trial it could or would produce evidence to establish that the value of the stallion at the time of its death was less than that fixed by Peck in his evidence upon the original trial, but contents itself with declaring that the testimony of Peck on the trial in the county court was true, "and that said stallion was worthless as he alleged in his answer and swore to as shown by his testimony."

The established rule in this jurisdiction is that the granting or refusal of a new trial is always a matter largely within the legal discretion of the trial court, and, unless it clearly appears that such discretion has been abused by disregard of the established rules of law, its action will not be disturbed upon appeal.

In Vickers v. Philip Carey Co., 49 Okla. 231, 151 Pac. 1023, it is held:

"The phrase 'discretion of court,' as applied to granting and denying new trials, means a legal discretion, to be exercised in discerning the course prescribed by law according to principles ascertained by adjudged cases."

We cannot say from the record before us that the trial court abused its discretion in refusing to grant a new trial.

The judgment should therefore be affirmed.

By the Court: It is so ordered.